IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROBIN J.,[1]

Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

Defendant.

No. 2:25-cv-00505-HZ

OPINION & ORDER

Chad Hatfield
Hatfield Law, PLLC
8131 W. Klamath Ct
Suite D
Kennewick, WA 99336

Attorneys for Plaintiff

Susanne Luse
Assistant United States Attorney
District of Oregon
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204

Ryan Lu
Special Assistant United States Attorney
Social Security Administration
6401 Security Boulevard
Baltimore, MD 21235

Attorneys for Defendant

[1] In the interest of privacy, this Opinion uses only the first name and the initial of the last name of the non-governmental party or parties in this case.

HERNÁNDEZ, District Judge:

Plaintiff Robin J. brings this action seeking judicial review of the Commissioner's final decision to deny supplemental security income ("SSI"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) (incorporated by 42 U.S.C. § 1383(c)(3)). The Court reverses the Commissioner's decision and remands this case for further administrative proceedings.

## PROCEDURAL BACKGROUND

Plaintiff applied for SSI on July 2, 2021, alleging an onset date of December 18, 2020. Tr. 224-39.[2] Her application was denied initially and on reconsideration.

On January 5, 2024, Plaintiff appeared with counsel for a hearing before an Administrative Law Judge ("ALJ"). Tr. 38-72. On March 22, 2024, the ALJ found Plaintiff not disabled. Tr. 18-32. The Appeals Council denied review. Tr. 1-6.

## FACTUAL BACKGROUND

Plaintiff alleges disability based on "chronic migrain[es], bad hip, [and] shoulder problems." Tr. 91. At the time of her alleged onset date, Plaintiff was 29 years old. Tr. 224. Plaintiff has a high school education and past relevant work as a storage facility rental clerk. Tr. 64.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). Disability claims are evaluated according to a five-step procedure. *See Valentine*

---

[2] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record, filed herein as Docket No. 10.

*v. Comm'r*, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability). The claimant bears the ultimate burden of proving disability. *Id.*

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity." If so, the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520(b). In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140–41; 20 C.F.R. § 404.1520(c). If not, the claimant is not disabled. *Id.*

In step three, the Commissioner determines whether the claimant's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 141; 20 C.F.R. § 404.1520(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform their "past relevant work." 20 C.F.R. § 404.1520(e). If the claimant can perform past relevant work, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. *Yuckert*, 482 U.S. at 141–42; 20 C.F.R. § 404.1520(e)–(f). If the Commissioner meets their burden and proves that the claimant can perform other work that exists in the national economy, then the claimant is not disabled. 20 C.F.R. § 404.1566.

## THE ALJ'S DECISION

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since her July 2, 2021, alleged onset date. Tr. 21. At steps two and three, the ALJ determined that Plaintiff has the severe impairments of "obesity, mild lumbar degenerative disease, polycystic ovary syndrome [PCOS], pelvic adhesions, right carpal tunnel syndrome status post release, headache disorder, depression, and anxiety." Tr. 21. However, the ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. Tr. 22. The ALJ concluded that Plaintiff has the residual functional capacity to perform light work with the following limitations:

> [Plaintiff] can lift and/or carry twenty pounds occasionally and ten pounds frequently. [Plaintiff] can stand and/or walk for six hours and sit for six hours in an eight-hour workday. [Plaintiff] requires a sit/stand option approximately every thirty minutes for five minutes while remaining at the workstation. [Plaintiff] can never climb ladders, ropes or scaffolds. [Plaintiff] can occasionally climb ramps/stairs, stoop, crouch, kneel and crawl. [Plaintiff] can occasionally perform overhead reaching. [Plaintiff] should avoid exposure to moving dangerous machinery or unprotected heights. [Plaintiff] can perform simple, routine, repetitive tasks. [Plaintiff] can perform no production pace/conveyor belt tasks (non-worker controlled pace). [Plaintiff] must work in a predictable work environment with occasional, brief interaction with the public and coworkers (interaction with supervisors will generally be up to occasional though interaction may increase for training).

Tr. 24. At step four, the ALJ concluded that Plaintiff can perform her past relevant work as a storage facility rental clerk. Tr. 30. At step five, the ALJ found that Plaintiff could perform other work in the national economy. Tr. 30-31. The ALJ, therefore, concluded that Plaintiff is not disabled. Tr. 32.

## STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings "are based on legal error or are not supported by substantial evidence

in the record as a whole." *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (internal quotation marks omitted). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. *Id.*; *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." *Vasquez*, 572 F.3d at 591 (internal quotation marks and brackets omitted); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

## DISCUSSION

Plaintiff contends the ALJ erred when he (1) partially rejected Plaintiff's testimony; (2) partially rejected the opinions of Allison Khavkin, M.D., and Andrea Moore, M.D.; (3) failed to consider Listing 11.02 at step three; and (4) found at steps four and five that Plaintiff could perform her past relevant work and/or other work that exists in the national economy.

### I. Plaintiff's Testimony

The ALJ is responsible for evaluating symptom testimony. SSR 16-3p, 2017 WL 5180304, at *1 (Oct. 25, 2017). "The ALJ 'engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.'" *Putz v. Kijakazi*, No. 21-35733, 2022 WL 6943095, at *2 (9th Cir. Oct. 12, 2022) (quoting *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014)). First the ALJ determines "whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to

produce the pain or other symptoms alleged." *Putz*, 2022 WL 6943095, at *2 (quotation omitted). The claimant need not show the "impairment could reasonably be expected to cause the severity of the symptom . . . alleged; [the claimant] need only show that it could reasonably have caused some degree of the symptom." *Garrison*, 759 F.3d at 1014 (quotation omitted). "If the claimant satisfies the first step of this analysis, and there is no evidence of malingering, the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear[,] and convincing reasons for doing so." *Putz*, 2022 WL 6943095, at *2 (quotation omitted). *See also Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 883 (9th Cir. 2006) (same). When evaluating subjective symptom testimony, "[g]eneral findings are insufficient." *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (quotation omitted). "An ALJ does not provide specific, clear, and convincing reasons for rejecting a claimant's testimony by simply reciting the medical evidence in support of his or her residual functional capacity determination." *Brown-Hunter v. Colvin*, 806 F.3d 487, 489 (9th Cir. 2015). Instead, "the ALJ must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." *Holohan v. Massanari*, 246 F.3d 1195 (9th Cir. 2001); *see also Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discount the claimant's testimony.").

On December 7, 2021, Plaintiff completed an Adult Function Report in which she stated she is "in pain all the time, . . . with any physical activity, movement of any kind or after [she has] eaten the pain turns into a searing, ripping, stabbing feeling like [her] insides are being ripped apart." Tr. 265. Plaintiff stated that the "pain is so violent [she] get[s] light headed and dizzy." *Id*. Plaintiff noted she has two children, but her parents, the father of her children, and "older kids in [her] home," help her care for her children because "lots of time" she is "in bed all

day due to the pain." Tr. 266. Plaintiff cannot "bend over to put pants, socks, or shoes on without pain"; can shower for "short periods," but has a hard time washing her hair "due to arm/wrist pain"; has "excruciating pain with every bowl [*sic*] movement, gas, or bloating"; and going to the bathroom takes her a long time. *Id.* Plaintiff cannot cook, do housework, do yardwork, or drive due to abdominal pain and pain in her wrist. Tr. 268. Plaintiff reads, watches television, and plays puzzle games on her phone. Tr. 269. Plaintiff rarely goes outside, does not have friends, and "some days can't even get out of bed." *Id.* "[A]ny physical activity leaves [Plaintiff] in constant pain." Tr. 270. Plaintiff follows written instructions "well" and gets along with authority figures "well enough," but does not handle stress or changes in routine well. Tr. 270-71. Plaintiff states she has anxiety, she is "extremely OCD, routine driven, doesn't handle change at all, [and is] severely depressed because of [her] pain and health issues." Tr. 271. Plaintiff notes:

> Adhesive disease has allowed my large intestine to become attached to my abdominal wall. As my scaring internally will never go away the chances of it becoming attached to other organs, causing my organs to stick together. There is no cure or treatment except for treating the pain. Any additional surgeries make more scar tissue build up so the only ting left to happen is for it to get worse, much worse.

Tr. 272.

At the January 5, 2024 hearing Plaintiff testified that she suffers from anxiety that sometimes makes it hard to speak, causes her to feel overwhelmed, and sometimes causes her mind to "just go[] blank." Tr. 48. When Plaintiff is having anxiety and feels overwhelmed, she will start to cry and has to "remove [herself] from the situation" and listen to music or do puzzles for 30 to 60 minutes to calm down. Tr. 48-49. This occurs three to seven days per week. When her anxiety is "extremely high," calming down can take "a few hours." Tr. 49. This happens "three to four days out of the week." Tr. 51. Sometimes when Plaintiff is anxious, she also gets

irritable, frustrated, and overwhelmed and will "yell at the first person who is right there" and either go into her room and throw, kick, or punch things, or leave the house and walk outside. Tr. 49-50. Plaintiff stated that when she is "having those episodes" and someone tries to talk to her, she "just start[s] going off on them." Tr. 50. Plaintiff has had to reschedule appointments and make up excuses not to "hang out with" friends because she does not want to leave the house. Tr. 51-52.

Plaintiff stated that she suffers from depression and sometimes her pain makes her more depressed such that she does not want to get out of bed. Tr. 53.

Before the January 2023 removal of a benign tumor in the superomedial orbital wall of her sinuses, she had daily migraine headaches, but since then her headaches have stopped. Tr. 54-55.

Plaintiff testified that the condition causing her the most pain is her abdominal adhesion resulting from the "extensive build up of scar tissue from all of [her] surgeries . . . the gallbladder[,] . . . ovary removal," and two caesarean sections. Tr. 57. "Every . . . little movement," including bending over or bowel movements, causes pain. Tr. 56-57. Sometimes when she has to go to the bathroom it takes "an hour or two" because of the pain. Tr. 57.

Plaintiff also has pain in her back, right arm, and right shoulder. Plaintiff testified she cannot walk for more than 30 minutes "without needing to sit down because [her] spine . . . hurt[s]." Tr. 58. Plaintiff is "not supposed to sit for extended periods" and stated that she was told by physical therapy that if she "is going to sit for more than 10 minutes [she needs] to have a lumbar support because" she has "discs degenerating" in her lower spine," which causes "one of the discs to slip out and press against [her] spinal cord, which is causing . . . nerve pain" in her legs. Tr. 59. If Plaintiff "shift[s] side to side" or "tries to twist [her] body . . . it hurts in [her]

abdomen" due to her abdominal adhesive disease. Tr. 58. As a result of these limitations Plaintiff often lies in bed all day and will "go from laying on [her] left side," to her back, then to her right side. Tr. 59. On a typical day, Plaintiff spends half the day lying down. Tr. 60.

Plaintiff also has pain in her right hand and arm from carpal tunnel syndrome. Plaintiff experiences pain and spasms in her right hand and stated she can "probably last with [her] hands for . . . five minutes, before it starts to . . . hurt and the pain . . . shoots all the way up [her] arms" if she tries "writing or typing [or] . . . preparing food." Tr. 62. Plaintiff had carpal tunnel release surgery in December 2021, but it did not improve her pain even though imaging showed "there were no more signs of carpal tunnel." Tr. 62. Plaintiff states she was "diagnosed with osteo arthritis" after her surgery and her "primary doctors said that was most likely the cause of" her continued "severe pain in [her] wrist." *Id.*

Finally, Plaintiff stated she takes 900 milligrams of Gabapentin per day for nerve pain and it makes her "feel sluggish sometimes throughout the day" and she needs to nap during the day after she takes her children to school. Tr. 60. Plaintiff naps on average from three to six hours per day and sometimes unintentionally falls asleep. Tr. 61.

The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, [Plaintiff's] statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." Tr. 25. The ALJ noted that a July 2022 MRI of Plaintiff's lumbar spine showed "a mild paracentral disc bulge with a very small laminal tear. . . . This does not cause appreciable neural foraminal compromise or spinal stenosis. . . . [A] mild diminished T2 signal . . . [and] a slight loss of disc space height." Tr. 426. These findings

were "consistent with mild degenerative changes at the L5-S1 disc." *Id.* In addition, "medical findings on exam [were] not consistent with [Plaintiff's] alleged severity of . . . limitations." Tr. 26. For example, during an April 2022 consultative examination Plaintiff's right and left grip strengths were normal and both upper extremities had 4/5 strength. Tr. 414. In August and November 2022 Plaintiff had 4/5 strength in all extremities. Tr. 644, 655. Nerve conduction studies of her bilateral lower extremities were normal in October 2022 and there was "[n]o electrophysiologic evidence for bilateral lumbosacral radiculopathy, lumbosacral plexopathy, or peripheral neuropathy of the bilateral lower extremities." Tr. 648. In addition, Allison Khavkin M.D., stated in her January 2024 medical report that although Plaintiff has pelvic adhesive disease that causes "chronic pelvic and abdominal pain," Plaintiff does not "have to lie down and/or elevate legs during the day" and that none of Plaintiff's medications "have any side effects or limit [Plaintiff's] activities." Tr. 695.

The ALJ noted that Gary Sacks, Ph.D. conducted a consultative psychological examination of Plaintiff in December 2022 and stated Plaintiff "complained about concentration and memory difficulties in excess of observed impairment." Tr. 485.

The Court concludes on this record that the ALJ did not err when he partially rejected Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms because the ALJ provided clear and convincing reasons supported by substantial evidence in the record for doing so.

## II. Medical Opinion Evidence

Plaintiff contends the ALJ erred when he partially rejected the opinions of Drs. Khavkin and Moore.

For claims filed on or after March 27, 2017, ALJs are no longer required to give deference to any medical opinion, including treating source opinions. Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c. Instead, the agency considers several factors. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). These are: supportability, consistency, relationship to the claimant, specialization, and "other factors." 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The "most important" factors in the evaluation process are supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

Under this framework, the ALJ must "articulate . . . how persuasive [they] find all of the medical opinions" from each doctor or other source. 20 C.F.R. §§ 404.1520c(b), 416.920c(b)(2). In doing so, the ALJ is required to explain how supportability and consistency were considered and may explain how the other factors were considered. 20 C.F.R §§ 404.1520c(b)(2), 416.920c(b)(2). When two or more medical opinions or prior administrative findings "about the same issue are both equally well-supported . . . and consistent with the record . . . but are not exactly the same," the ALJ is required to explain how the other factors were considered. 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3). "Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

**A. Dr. Khavkin**

On January 5, 2024, Dr. Khavkin completed a medical report in which she noted Plaintiff's diagnoses of abdominal and pelvic adhesive disease, chronic pelvic pain, and PCOS result in chronic pelvic and abdominal pain and painful intercourse. Tr. 695. Dr. Khavkin cited

"laproscopathy confirm[ing] severe adhesive disease" as the clinical finding/test result that supported these diagnoses. Dr. Khavkin checked "no" in response to whether Plaintiff has "to lie down and/or elevate legs during the day" and whether "any of [Plaintiff's] medications have any side effects or limit [Plaintiff's] activities." *Id.* She stated that plaintiff's abdominal and pelvic adhesions are "reasonably likely to cause pain" and "[d]ue to chronic waxing and waning of symptoms, [it is] likely an employer would not tolerate the unscheduled days off." *Id.* Dr. Khavkin opined that if Plaintiff attempted "to work a 40-hour per week schedule [it is] more probable than not that [Plaintiff] would" on average miss "4 days or more" of work per month," but she did not complete the section requesting an explanation for that opinion. Tr. 696. Dr. Khavkin limited Plaintiff to sedentary work and stated she has "manipulative limitations involving the upper extremities," but did not complete the section setting out how often Plaintiff is limited in reaching, handling, or fingering with either or both extremities. *Id.* Finally, Dr. Khavkin opined that "[b]ased on the cumulative effect of all limitations," Plaintiff would likely "be off task and unproductive . . . over 30%" of a 40-hour workweek. Tr. 697.

The ALJ did not find Dr. Khavkin's opinion to be persuasive because "[i]t is too limiting based on the objective findings[.]" Tr. 29. The ALJ noted that "[t]here is no basis provided for the opinion that [Plaintiff] would be absent from work four or more days per month. There is no description of why [Plaintiff's] symptoms would be so limiting." *Id.* Plaintiff asserts the ALJ's conclusory statement fails to constitute the substantial evidence required to reject a physician's opinion about a claimant's physical and mental limitations.

Dr. Khavkin opined that pain from Plaintiff's abdominal and pelvic adhesions and that the waxing and waning of the symptoms from that condition are likely to cause her to miss work. Dr. Khavkin's treatment records reflect that in April 2021 Plaintiff reported "it feels like

my insides are tearing apart" when she attempted to walk or exercise and a May 2021 laparoscopy showed "plenty of adhesive disease." Tr. 347, 354. Nevertheless, in May 2021 Dr. Khavkin referred Plaintiff to physical therapy. The physical therapist reported Plaintiff was "very fatigued . . . secondary to deconditioning" and "was again quite fatigued following treatment." Tr. 452, 454. The therapist did not, however, note that Plaintiff had abdominal pain during treatment. In March 2022 Plaintiff reported she shifted a dresser in her house "a bit," but she did not have trouble with her exercises at physical therapy. Tr. 465-66. In September 2023 Dr. Khavkin noted Plaintiff "reported having discomfort on her right side" after an IUD insertion, "but notes this is normal for her. [Plaintiff] thinks it [is] an adhesion causing issues with her BMs." Tr. 355.

"[A]ssessments that are substantiated by a physician's treatment records may be entitled to consideration that an otherwise unexplained opinion would not receive." *Yun v. Comm'r of Soc. Sec. Admin.*, No. CV-25-00090-TUC-JAS (BGM), 2026 WL 803156, at *7 (D. Ariz. Jan. 26, 2026), report and recommendation adopted, No. CV-25-00090-TUC-JAS (BGM), 2026 WL 801702 (D. Ariz. Mar. 23, 2026) (quotation omitted). *See also Pickett v. King*, 2024 WL 5398771, at *2 (9th Cir. Feb. 10, 2025) (internal citations and quotation marks omitted) ("An ALJ may . . . reject an opinion that is brief, conclusory, and inadequately supported by clinical findings, provided on a check-box form with little to no explanation, or that lacks support in the record as a whole."). Dr. Khavkin's treatment records, however, do not contain evaluations or descriptions that substantiate her statement that Plaintiff's PCOS or adhesive disease would cause her to miss more than four days of work per month or to be off task over thirty percent of the time.

On this record the Court concludes the ALJ did not err when he found the portion of Dr. Khavkin's opinion stating Plaintiff could miss more than four days of work per month or to be off task over thirty percent of the time was not persuasive because the ALJ provided reasons for doing so based on substantial evidence in the record.

**B. Dr. Moore**

On January 4, 2024, Dr. Moore completed a mental residual functional capacity assessment of Plaintiff. Dr. Moore stated that Plaintiff was markedly limited in her ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest breaks; to accept instructions and respond appropriately to criticism from supervisors; to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; to interact with others; and to adapt or manage herself. Tr. 690-92. Dr. Moore noted Plaintiff was severely limited in her ability to travel in unfamiliar places or use public transportation. Tr. 691. Dr. Moore opined that "[b]ased on [her] cumulative limitations," Plaintiff is "likely to be off task and unproductive . . . 21-30%" of the workweek and likely to miss four or more days of work per month. Tr. 693.

The ALJ did not find this opinion to be persuasive on the bases that there "is no explanation for the limitation provided to support the opinion" and it is inconsistent with the objective findings in the record and with the findings of Dr. Sacks' evaluation on December 9, 2022.

On December 9, 2022, Gary Sacks, Ph.D., conducted a psychodiagnostic evaluation of Plaintiff. He noted Plaintiff's "[a]ffect was irritable and her mood appeared dysthymic, " but her "[p]sychomotor behavior was normally paced[,] . . . [her] [s]pontaneous speech was fluent with intact syntax and grammar," and she "had no difficulty following the examiner throughout the clinical interview." Tr. 485. Plaintiff "complained about concentration and memory difficulties in excess of observed impairment. She seemed to have no difficulty recalling relevant personal detail today." *Id*. Dr. Sacks did not note any "signs of psychosis" and Plaintiff's "thoughts were clear[,] logical[,] and sequential." *Id.* Plaintiff told Dr. Sacks that "her mood has been consistently sad for years. She often finds herself crying. Her sleep is poor. . . . She is not motivated for once pleasurable activities. She complained about feelings of hopelessness and worthlessness." Tr. 487. Plaintiff "denied a history of panic attacks[,] . . . does not suffer obsessions or compulsions," and "lik[es] everything in its place, but does not spend sufficient time ordering things to cause a problem." Dr. Sacks stated that Plaintiff "described concentration difficulties in excess of observed impairment," but diagnosed Plaintiff with persistent depressive disorder. Tr. 487.

Dr. Moore's treatment notes reflect that on September 14, 2023, she saw Plaintiff for a psychological assessment. Plaintiff stated she has no energy or motivation, she "sleeps most of the day after her kids go to school," she has "trouble with focus," she is "tired all the time," she likes to read or play games on her phone, she "worries all the time," she "struggles with falling and staying asleep," she avoids social situations, and "she needs to have objects arranged in a certain way." Tr. 616. Dr. Moore noted that during the evaluation Plaintiff was "restless, shifts back and forth in chair, grips chair handles, intermittent eye contact"; her affect was "dysphoric, frustrated"; her thought process was linear; her judgment was "fair to intact"; and

she was oriented to person, place, time, and situation. Tr. 618. Dr. Moore stated Plaintiff's presentation was consistent with Plaintiff's diagnoses of major depressive disorder and generalized anxiety disorder, but insufficient for a diagnosis of obsessive compulsive disorder. *Id.* Dr. Moore prescribed duloxetine and recommended continuing therapy. On November 1, 2023, Plaintiff reported to Dr. Moore that the duloxetine was helping, but she ran out and did not get a refill. Tr. 606. Dr. Moore noted Plaintiff's affect was "dysphoric, congruent"; her thought process was linear; her insight was "fair to intact"; and she was oriented to person, place, time, and situation. Tr. 606-07. Dr. Moore's diagnosis remained major depressive disorder and generalized anxiety disorder. She directed Plaintiff to resume taking duloxetine. None of Dr. Moore's treatment notes set out limitations based on Plaintiff's mental-health symptoms.

In March 2023 Plaintiff reported to Dawn Dunfee, Q.M.H.P, "feeling down, depressed and hopeless"; having "trouble falling asleep, staying asleep and sleeping too much"; "feeling tired and having little energy, poor appetite and overeating"; having "trouble concentrating"; "being fidgety, feeling nervous, anxious and on edge, not being able to stop or control worrying"; having "trouble relaxing, being so restless that it's hard to sit still"; and "becoming easily annoyed and irritable." Tr. 624. Dunfee noted Plaintiff's affect was "primarily appropriate," her mood was "neutral," her memory was "unimpaired" recent and remote, and her insight and judgment were "good." Tr. 627-28. Dunfee diagnosed major depressive disorder and generalized anxiety disorder and recommended therapy.

Dr. Moore did not provide an explanation in her January 2024 opinion for the numerous marked limitations set out therein. Although the check-the-box form completed by Dr. Moore contained a section asking for "comments," Dr. Moore did not provide any further support for her assessed limitations. "While an opinion cannot be rejected merely for being

expressed as answers to a check-the-box questionnaire, the ALJ may permissibly reject check-off reports that do not contain any explanation of the bases of their conclusions." *Ford v. Saul*, 950 F.3d 1141, 1155 (9th Cir. 2020). Moreover, although check-the-box "assessments that are substantiated by a physician's treatment records may be entitled to consideration that an otherwise unexplained opinion would not receive," Dr. Moore's treatment records do not contain the kind of substantive evidence that courts have found sufficient to require consideration of check-the-box questionnaires. For example, in *Yun*, the records of the doctor who filled out the check-the-box form were "replete with references to the severity of Plaintiff's symptoms and conditions." *Yun*, 2026 WL 803156, at *7 (citing record "observing that Plaintiff's recurrent major depressive disorder was not well controlled," that Plaintiff was "not able to work due to severe symptoms," that the plaintiff "[w]ill likely need long term disability given severity of anxiety/depression," that the plaintiff had "worsening cognitive impairment," and a "severe episode of recurrent major depressive disorder").

On this record the Court concludes the ALJ did not err when he found Dr. Moore's opinion to be unpersuasive because the ALJ provided reasons for doing so based on substantial evidence in the record.

## III. Step Three

Plaintiff alleges the ALJ erred when he failed to consider Listing 11.02 for Plaintiff's severe headaches and failed to properly evaluate Plaintiff's mental health impairments at step three.

### A. Listing 11.02

The ALJ found Plaintiff's headaches to be severe, noted there is no listing for headaches, considered whether Plaintiff's symptoms medically equal a listing pursuant to Social

Security Ruling 19-4p, and concluded Plaintiff's headache impariment did not meet or equal a listing. Tr. 21, 22.

Social Security Ruling 19-4p states: "Primary headache disorder is not a listed impairment in the Listing of Impairments (listings); however, we may find that a primary headache disorder . . . medically equals a listing." SSR 19-4p, 2019 WL 4169635, at *7 (Aug. 26, 2019). "Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing." *Id.* SSR 19-4p notes that listing 11.02 paragraph B, "requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment. *Id.* Paragraph D "requires dyscognitive seizures occurring at least once every 2 weeks for at least 3 consecutive months despite adherence to prescribed treatment, and marked limitation in one area of functioning." *Id.* Listing 11.02 defines dyscognitive seizures as "characterized by alteration of consciousness without convulsions or loss of muscle control." 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

The record reflects that on February 9, 2022, Plaintiff reported "having almost daily headaches" with "some photophobia and phonophobia." Tr. 436. On February 23, 2022, a CT scan of Plaintiff's head showed "[l]eft paranasal sinus disease with complete opacification of the frontal sinus and frontoethmoidal recess. This can contribute to headache." Tr. 435. On July 6, 2022, Plaintiff reported to her primary care physician that she "is being worked up for headaches and was scheduled to see a neurologist, but he wanted her sinuses treated first."

Tr. 489. Plaintiff was prescribed an antibiotic for 14 days to treat her sinusitis. In October 2022, Plaintiff reported she had no improvement of her sinus condition with medication and the examination showed "congestion and a little discolored mucous." *Id*. Plaintiff was prescribed a different antibiotic and told to obtain a CT scan after she finished taking the antibiotic. On November 1, 2022, Plaintiff was seen by Dionysios Klironomos, M.D., for a neurosurgery clinic evaluation for "chief complaint of headache, neck pain, [and] right arm pain." Tr. 643. On November 14, 2022, Plaintiff reported "some relief with the treatment," but that she was "still having headaches and drainage." *Id*. A CT scan "confirm[ed] an expansile mass in the left frontal/ethmoid region." *Id.* Plaintiff reported on February 22, 2023, that removal of her sinus tumor on January 19, 2023, "has relieved most of her pain." Tr. 674. On March 8, 2023, Plaintiff reported that "[s]he has not used the propranolol" prescribed for headaches. Tr. 587.

The Court concludes ALJ did not err when he failed to specifically consider Listing 11.02 for Plaintiff's severe headaches because the ALJ considered Plaintiff's headaches and found them to be severe and Plaintiff has not established she meets or equals the criteria for Listing 11.02 based on substantial evidence in the record.

**B. Mental Impairments**

Plaintiff alleges the ALJ erred at step three in his analysis of Plaintiff's mental impairments, particularly in failing to sufficiently evaluate the presence of "paragraph C" criteria. Plaintiff asserts that when Dr. Moore's opinion is properly accounted for, Plaintiff must be found to meet or equal Listings 12.04 and 12.06 "due to affirmation of the 'Paragraph C' criteria as well as a finding of marked limitations in the 'Paragraph B' criteria." Pl. Brief 23, ECF 14. The ALJ, however, found Dr. Moore's opinion and limitations to be unpersuasive and rejected Plaintiff's statements regarding the intensity, persistence, and limiting effects of her

symptoms and the Court has found the ALJ did not err in either of those conclusions. The Court, therefore, also concludes the ALJ did not err when he found Plaintiff's impairments did not meet or equal Listings 12.04 or 12.06.

## IV. Steps Four and Five

Plaintiff contends the ALJ erred at steps four and five when he found Plaintiff could perform her past relevant work and other work that exists in the national economy because Plaintiff's limitation to simple, routine, repetitive tasks precludes jobs with Level Two reasoning; the ALJ failed to provide a rationale for his finding that Plaintiff's interaction with supervisors may increase for training; and the ALJ provided an incomplete hypothetical to the VE.

### A. Level Two Jobs

The ALJ found that Plaintiff "can perform simple, routine, repetitive tasks." Tr. 24. At the hearing, the vocational expert ("VE") noted Plaintiff's past relevant work was reasoning level two and he identified three additional jobs that Plaintiff could perform, all of which require reasoning level two. Plaintiff asserts the ALJ erred when he found Plaintiff could perform jobs that require reasoning level two because level two "requires the ability to carry out detailed tasks/instructions," and the limitation to simple, routine, repetitive tasks "precludes the performance of all jobs requiring level two reasoning." Pl. Brief 18-19.

The Dictionary of Occupational Titles ("DOT") separates reasoning levels into six categories and level two requires the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations." DOT, App. C, 1991 WL 688702.

The Ninth Circuit has held that a "claimant's limitation to 'simple and routine work tasks' is 'inconsistent with the demands of level-three reasoning' because the plaintiff's

residual functional capacity was more consistent with Level 2 than Level 3 Reasoning." *Zavalin v. Colvin*, 778 F.3d 842, 846-47 (9th Cir. 2015) (quotation omitted). The Ninth Circuit has not, however, held that the limitation to simple and routine tasks is inconsistent with the demands of level two reasoning. District courts within the Ninth Circuit have "held repeatedly that the limitation to perform simple and routine tasks is not inconsistent with Reasoning Level 2 jobs." *Gilbert v. Colvin*, 6:14-cv-00394-AA, 2015 WL 1478441, at *6-*7 (D. Or. Mar. 31, 2015) (collecting cases). *See also Amanda B. v. Comm'r,* 3:20-CV-00434-BR, 2021 WL 4993944, at *9 (D. Or. Oct. 26, 2021), aff'd sub nom. *Bradshaw v. Kijakazi*, No. 21-36014, 2022 WL 17500610 (9th Cir. Dec. 8, 2022) (court concluded that the limitation to "unskilled, repetitive, routine tasks in two-hour increments" was consistent with reasoning level two).

The Court concludes the ALJ did not err when he found Plaintiff could perform her reasoning level two past relevant work and other work that exists in the national economy even though Plaintiff was limited to simple, routine, repetitive tasks.

**B. Interaction with Supervisors**

Plaintiff contends the ALJ erred when he limited Plaintiff to occasional interaction with supervisors, but allowed that "interaction with supervisors . . . may increase for training" because the ALJ provided no rationale for the finding that Plaintiff could tolerate more than occasional interaction for training. Plaintiff cites *Leitz v. Kijakazi*, No. 22-35356, 2023 WL 4342114 (9th Cir. July 5, 2023), to support her argument.

In *Leitz* the ALJ held that the plaintiff could "have brief, superficial interaction with co-workers and the public; and can have occasional interaction with supervisors (although additional time for training is acceptable)." *Id.*, at *2. The plaintiff asserted that "the parenthetical in the ALJ's assessment of [her] RFC: was "not supported by substantial evidence."

*Id.* The government asserted that the "caveat rest[ed] on a 'common sense' inference from the record," which reflected that the plaintiff "could tolerate more than occasional interactions with supervisors at work, but only for a short period of time (up to one month); after that, because of her anxiety and PTSD, [the plaintiff] needed to reduce her supervisor interactions to only occasional." *Id*. The government, however, "cite[d] no evidence to support this explanation and . . . [t]he ALJ did not state in his opinion what the Government's attorney . . . present[ed] as an explanation for the RFC." *Id.* The Ninth Circuit pointed out that it is "'constrained to review the reasons the ALJ asserts.'" *Id.* (quoting *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (cleaned up)). "An ALJ's decision must be analyzed based on his reasoning and findings, 'not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking.'" *Id.* (quoting *Bray v. Comm'r*, 554 F.3d 1219, 1225 (9th Cir. 2009)). "Without an explanation for the training-period caveat, the court is left to speculate as to what evidence, if any, is the basis of the ALJ's reasoning and conclusion." *Id.* The court noted that there was no evidence in the record that indicated the plaintiff's "mental problems are somehow alleviated during training periods because they are less likely to include supervisor interactions than other work periods, or that employers would be willing to tolerate her limitations during training periods." *Id*. "Because the training-period caveat has no foundation in any part of the record and is wholly unexplained," the court found that "the caveat is not supported by substantial evidence" and "[t]he caveat and its conclusion cannot be sustained." *Id.* The court also noted that the VE "clearly testified that [the plaintiff] would not have the RFC to perform the any of the available jobs unless her RFC included the training-period caveat. Thus, without the training-period caveat, [the plaintiff] must be considered disabled." *Id.*, at *3. Accordingly, the record "demonstrate[d] that [the plaintiff was] entitled to benefits when the training-period caveat is struck from the RFC." *Id.*

Here, as in *Leitz,* the ALJ did not provide any evidentiary basis for the caveat that "interaction [with supervisors] may increase for training." Tr. 24. The government asserts this caveat is supported by the fact that state agency psychological consultant, Irmgard Friedburg, Ph.D., found plaintiff was "capable of appropriate co-worker and supervisor interaction." Tr. 137. The ALJ, however, did not cite this explanation, or any explanation for the caveat and this Court may not rely on "'post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking.'" *Id.,* at *2 (quoting *Bray,*, 554 F.3d at 1225). Accordingly, the Court concludes the ALJ erred when he found that Plaintiff's "interaction [with supervisors] may increase for training."

**V. Remand**

The decision whether to remand for further proceedings or for immediate payment of benefits generally turns on the likely utility of further proceedings. *Harman v. Apfel*, 211 F.3d 1172, 1179 (9th Cir. 2000). When "the record has been fully developed and further administrative proceedings would serve no useful purpose, the district court should remand for an immediate award of benefits." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004). The decision whether to remand this case for further proceedings or for the payment of benefits is a decision within the discretion of the court. *Harman*, 211 F.3d 1178.

The Ninth Circuit has established a three-part test "for determining when evidence should be credited and an immediate award of benefits directed." *Harman*, 211 F.3d at 1178. The Court should grant an immediate award of benefits when:

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting . . . evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Id.* The second and third prongs of the test often merge into a single question: Whether the ALJ would have to award benefits if the case were remanded for further proceedings. *Id.* at 1178 n.2.

Plaintiff asserts that as in *Leitz,* this Court should reverse and remand for benefits because the ALJ erred when he found Plaintiff's interaction with supervisors may increase for training. In *Leitz,* however, the VE "clearly testified that [the plaintiff] would not have the RFC to perform the any of the available jobs unless her RFC included the training-period caveat." *Leitz*, 2023 WL 4342114, at *3. Here the VE was not asked whether Plaintiff would have the RFC to perform any of the available jobs if her interaction with supervisors could not increase with training. Plaintiff's counsel asked the VE:

> [I]f an individual can only tolerate supervision on an occasional basis - and so, if they had training, they would have to stop, because of an hour-long training period - they couldn't make it through the hour-long training period. They could only do like 20 minutes of it and would have to stop and schedule it for a different time or if there is a one-day training and they could only do it two or three and half hours and have to stop and have to reschedule it another time, in your opinion, would such an individual in a competitive work environment, be able to sustain employment?

Tr. 71. The VE responded, "[n]ot based on the way you've described it. . . . I don't believe so." *Id.* The record does not reflect what the ALJ meant by increased interaction or what the duration of the "training" time would be for the identified jobs. Plaintiff's questions to the VE do not clarify the duration of the training time. This question and the ALJ's evaluation of an individual with Plaintiff's limitations to complete the training are outstanding issues and, therefore, further administrative proceedings would be useful. Accordingly, the Court remands this matter to the Commissioner for further administrative proceedings.

**CONCLUSION**

For these reasons, the Commissioner's decision is REVERSED and REMANDED for

administrative proceedings consistent with this Opinion and Order.

IT IS SO ORDERED.

DATED: August 19, 2026

MARCO A. HERNÁNDEZ
United States District Judge